IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

CODY H. V. KATHRYN H.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

CODY H., APPELLEE,

V.

KATHRYN H., APPELLANT.

Filed January 9, 2024.    No. A-23-323.

Appeal from the District Court for Dakota County: EDWARD H. MATNEY, Judge. Reversed and remanded with directions.

Robert B. Deck, of Deck Law P.L.C., for appellant.

John S. Moeller, of John S. Moeller, P.C., for appellee.

PIRTLE, Chief Judge, and MOORE and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Cody H. filed a "Petition and Affidavit to Obtain Domestic Abuse Protection Order" against his wife, Kathryn H., in the Dakota County District Court. Cody sought a protection order for himself and on behalf of the parties' minor child. An ex parte domestic abuse protection order was entered, and it was subsequently affirmed after an evidentiary hearing. Kathryn appeals, claiming there was insufficient evidence in the record to support that she abused Cody and the minor child. We agree, and we therefore reverse and remand with directions to vacate the domestic abuse protection order entered against Kathryn.

## II. BACKGROUND

### 1. PETITION AND EX PARTE ORDER

On February 15, 2023, Cody, for himself and on behalf of the parties' son, filed a "Petition and Affidavit to Obtain Domestic Abuse Protection Order" against Kathryn pursuant to Neb. Rev. Stat. § 42-924 (Cum. Supp. 2022). Cody requested a county court judge to preside over the action. See § 42-924(2) and Neb. Rev. Stat. § 25-2740 (Cum. Supp. 2022) (petition for protection order may be heard by county court or district court but petition shall be filed in district court and is considered district court proceeding). We will refer to the county court judge presiding over the matter as the trial court.

In his petition and affidavit, Cody attached a journal describing various dated incidents of alleged abuse which took place from "Approx. Early 2020" to February 13, 2023. He prefaced his itemized list by saying that he had documented for 2 years "the major bulletins of [Kathryn's] domestic abuse," and that it was "mental except for three instances," one of which involved his "first son." He alleged that he had been blamed for Kathryn's self-harm and suicidal thoughts "over the last few years," and that he had been "manipulated and gaslighted to question even [his] own truth at times." He claimed to have "lived in fear of her for too long, thinking that if [he] stayed his son would be safe and in turn, [Cody] could help her as well." The incidents described in the journal included instances wherein Kathryn: had a "random man over and was sitting next to him with leg draped over him" who "she admitted to talking" to on a "sex website"; used marijuana; failed to take her medications; expressed difficulty caring for the parties' child (indicated to be 1 year of age); admitted being suicidal in January 2023; told Cody he needed to leave the house; was "visibly shaking and clenching fists at [Cody] and [he] was in fear for [his] safety" and the child's; threw dishes into the sink and yelled at Cody about how he did not "do anything" and "how worthless [he was] around the house"; told Cody's "first son" (from a prior relationship) he needed to color if he wanted to go home, threw a crayon at him, and "grab[bed] him . . . and force[d] him to color with what look[ed] like a lot of crayons at the same time almost in a shaking manner"; communicated with prior romantic partners; claimed that Cody did not "intellectually stimulate her and that's what causes her to seek out other people"; was self-harming in "[e]arly 2020"; and was admitted to a mental health crisis center "due to self harm and suicidal thoughts." Cody also alleged that in "Fall 2022," Kathryn hit him "across the face" in front of a coworker when he "said some sort of joke," and in October 2022, the parties' son slapped Kathryn "in the face so [she] slapped him back."

On February 15, 2023, the trial court issued an ex parte domestic abuse protection order, prohibiting Kathryn from "imposing any restraint upon the person or liberty of [Cody and the child]" or "threatening, assaulting, molesting, attacking, or otherwise disturbing the peace of [Cody and the child]." The court further ordered that Kathryn be "removed and excluded from the residence" where Cody stated the parties resided with the child. The court also granted Cody temporary custody of the child. On February 16, Kathryn filed a "Request for Hearing – Protection Order," which the court granted that same day.

## 2. Show-Cause Hearing

On February 22, 2023, the trial court held a hearing on the matter; Cody and Kathryn each appeared with counsel. At the beginning of the hearing, the court indicated that Kathryn was to present her evidence first. Kathryn's counsel argued that the initial burden of proof was on the petitioner. The court disagreed, stating that it was the burden of the respondent to show why the order should not remain in effect, and that the "first burden is on the respondent." Kathryn's counsel made an objection regarding the court's procedure before the parties proceeded to put on their evidence, beginning with Kathryn.

### (a) Parties' Relationship History

Kathryn testified that the parties were married in August 2020 and that Cody was a jealous and possessive partner. She stated that he "never liked [her] male friends." She described an incident that took place before they were married where a male friend took a sip of Kathryn's drink at a bar, and in response, Cody followed the male friend, put his hands around the friend's neck, and told him that "it was not okay behavior and that he needed to stop." Kathryn also stated that she "never berated" Cody for their differences. According to Kathryn, Cody looked at her phone when she was "gone or in the shower, and then days later or weeks later," he would tell her she had "broken his trust."

According to Cody, after Kathryn told him she wanted a divorce, he told her he would move his "stuff" to the basement, and he hoped they would "make this a civil matter." However, a couple of days later when he saw Kathryn with an unknown man on their couch, he called the police because he did not feel safe "confronting her and him."

### (b) Minor Child

Kathryn took maternity leave for 2 months following the birth of the parties' son, then temporarily returned to work on a "[p]er request" basis, working 8 hours per week. However, Kathryn and Cody ultimately decided Kathryn should stay home with their son to care for him. Their son was born with various medical conditions which increased his care needs. Kathryn testified that she had been the child's primary caretaker since his birth. She took him to all his appointments, including weekly physical therapy. Until she was excluded from the family residence because of the ex parte protection order, she had not been apart from her son for more than 2 days since he was born. According to Kathryn, she and her son woke up, got ready for the day, made breakfast, prayed, and ate every meal together. She also clothed him, took him shopping, and entertained him.

The child's physical therapist provided testimony on Kathryn's behalf. The physical therapist testified that she worked at the Educational Service Unit in Wakefield, Nebraska. She began seeing the minor child in December 2021, initially visiting every week. The child was "late to walk, late to sit up, late to roll over, get in and out of sitting." The physical therapist implemented certain strategies to assist the child in reaching certain developmental milestones and showed Kathryn how to practice those strategies with the child. The physical therapist knew Kathryn completed the exercises with the child because Kathryn sent her video updates and the child demonstrated improvement between visits. According to the physical therapist, Cody was never

present during the child's physical therapy sessions, and the physical therapist observed that the child and Kathryn had a "very good bond."

Cody testified that, at times, Kathryn told him that she could not handle their son or that she was a bad mom. Kathryn explained that she had not received as much support from Cody in raising their son as she would have liked. She further claimed that at times she felt overwhelmed being their son's primary caretaker and expressed those feelings to Cody. However, according to Kathryn, those feelings were no more than the normal feelings a person might experience as a new parent. For example, she stated that she once told Cody that she felt "ill-equipped [at] being a mom" because their son was sick for the first time, and she had to take him to the emergency room without Cody. She stated that she believed "anybody has felt this way, [as] a parent, not knowing what to do in some cases."

(c) Alleged Incidents of Abuse

The parties testified regarding the various incidents of abuse Cody listed in the journal attached to his petition. Cody described an incident that took place when Kathryn was visiting his workplace in the fall of 2022. Cody and his coworker "ended up joking between each other." According to Cody, Kathryn "did not like what was said" so "she [balled] her hand up in a fist[] and hit [Cody] . . . on the side of the face." Kathryn testified that she used her non-dominant hand and that it was open when she slapped Cody's cheek. She claimed that Cody had a "history of belittling [her] and making comments about [her] appearance," and that his joke was "sexist and discriminatory." Kathryn further indicated that Cody's response was to say, "'Do not slap me again in public,'" to which she replied, "'Then don't say sexist and discriminatory things to me in public.'" Cody acknowledged that this was the only time Kathryn had ever hit him.

Cody described an incident when Kathryn expressed that she was "fed up" with their son and "couldn't handle him." During this incident, Kathryn threw a dish into the sink and another into the dishwasher while Cody and their son were in the kitchen with her. Cody claimed their son cried when this happened. According to Kathryn, "there was nothing broken" as a result of the incident.

Kathryn testified that on October 18, 2022, her son "was hitting [her], and he thought it was funny." She stated that she realized that her son had to learn that it was not funny to slap people, so she "slapped him back." However, she stated this "was not anything to injure him. It was, 'Hey, stop.'" Kathryn testified that her son did not have any mark or injury as a result of the incident. She stated that "[i]t was a playful context." Cody testified that he did not witness the incident but learned about it when Kathryn described it by text. Kathryn stated that when she informed Cody of the incident, he "laughed about [it] as a response." When asked whether he responded with "some sort of laugh," Cody said, "No, I did not." Cody acknowledged that he was not aware of any other incidents when Kathryn had "done anything physical to [the child]," nor was he aware of any instances when she threatened to harm their son. Kathryn testified that she would never harm or threaten to harm the parties' child.

According to Kathryn, she asked Cody for a divorce in early February 2023. A few days later, on February 11, Kathryn invited two male guests into the home, one of whom was a friend she considered a "big brother." Cody knew the friend but not the other man. Cody testified that he knew Kathryn met this other man on a website for "BDSM," which he described as a "sex

- 4 -

website." Kathryn denied this, stating that they instead met on a "friend app." Cody stated that Kathryn had her leg draped over this man's leg, and when he saw this, he felt unsafe and called law enforcement. When asked why he did not feel safe in the presence of Kathryn's guests, Cody stated that he felt threatened by the unknown man's "demeanor when the police were present," which he described as "very smug, very assertive." When asked on cross-examination why he felt unsafe before law enforcement arrived, he said that "[w]henever [he] tried to confront [Kathryn] with her talking to other men, it always [led] to a violent, aggressive argument."

When asked what prompted Cody to seek a protection order, Cody responded, "For the overall lack of staying medicated, suicidal thoughts and tendencies, and violent, aggressive behavior towards myself and my sons. And then including her sexual preferences of having multiple partners, I did not feel safe on my [be]half as well as my sons' [be]half."

Cody testified that Kathryn had anger episodes, which had become progressively worse over time. He stated that Kathryn was not taking her medication for her premenstrual dysphoric disorder (PMDD) and as a result would become depressed, suicidal, and aggressive. He stated that Kathryn had thrown toys within the house out of frustration and that she "violently sh[ook]" Cody's other son from a prior relationship when he was not following her directions. Kathryn acknowledged "getting frustrated" with Cody's other son; that son had behavior issues and when she tried to get him to color a picture for his mother, the child "threw it" at Kathryn, so she held it in his hand and helped him color. Kathryn said that she and Cody talked about the incident, as well as discussed discipline with the child and his mother and "what we should do after." Cody also testified that Kathryn would "ball her fist up and visibly shake at [Cody] as well as yell and scream at [him]," and that she would "ball her fist up and keep them in front of her chest in a shaking manner towards [him] . . . [a]lmost every time [they got] into an argument." However, when asked "how many times [Kathryn had] threatened to do harm to [him]," Cody responded, "None."

### (d) Family Home

Kathryn's mother, Carolyn A., testified that Kathryn and Cody rented the house they lived in from her. After the ex parte protection order was issued and Kathryn was removed from the family home, Carolyn notified Cody that she would be stopping by the house to pick up some of Kathryn's necessities. Cody did not respond to Carolyn's message; Cody "had always responded to [her] texts fairly quickly" and they "had a really good relationship." Although the home belonged to Carolyn, she went to the police department to request an escort to enter the home with her key on February 16, 2023. Kathryn remained in the car. One of the two police officers "pounded on the door" and when no one responded, he instructed Carolyn to "go ahead and unlock the door." Once she was inside, Cody reported a break-in at the house, which Carolyn learned by communications "on one of the officer's radios." The officers responded they were already at the residence. Carolyn picked up Kathryn's items and placed them in her vehicle.

While Carolyn was loading Kathryn's items, Cody arrived at the house and asked to see what was taken from the home. Cody insisted that the law enforcement officers arrest Carolyn for trespassing. The officer pointed out that Carolyn had texted Cody and he failed to respond. Cody claimed he did not see it and he continued to insist that they arrest Carolyn and that "it was bullshit" that they were not arresting her. Carolyn described the incident as "frightening" because she had never seen Cody behave that way before and she appreciated that the officers "put themselves

- 5 -

between [her] and Cody" and "continued to move him away from the car onto the sidewalk again, keeping their distance." Cody insisted that the officers have their supervisor come out, and when the sergeant arrived, Cody then requested the "sergeant's supervisor all the way up to the captain" come and arrest Carolyn for trespassing. The officers told Cody he could file a report and they gave him a clipboard. At that point, Carolyn got out of the car and Cody told her to take the dog and cat because he could not afford to feed them and if she did not take them, he was going to take them "to a shelter within the next day or two." According to Carolyn, the cat was Kathryn's therapy cat and the dog "they got from a shelter" for the parties' son's benefit. Arrangements were made for Carolyn to take the pets.

### 3. INTERIM AND FINAL DOMESTIC ABUSE PROTECTION ORDER

On February 24, 2023, the trial court entered an "Interim Order," stating that while the matter was taken under advisement, the court may "not [be] able to promptly rule." It therefore found that "interim visitation should be established as agreed upon between the parties until a full and final Order can be entered." It then ordered that Kathryn "have visitation" with the child every weekend from Friday at 5:30 p.m. until Monday at 7:30 a.m., with exchanges to take place at the law enforcement center.

On March 2, 2023, the trial court entered a "Modified Domestic Abuse Protection Order," finding that Cody showed that Kathryn "attempted to cause or intentionally and knowingly caused bodily injury with or without a dangerous instrument" or "by means of a credible threat, placed [Cody and the child] in fear of bodily injury." The order listed Cody and the child as the protected parties and stated that the ex parte order issued on February 15 would remain in effect for a period of 1 year from that date. The March 2 order maintained the terms of the ex parte order but noted that Cody's temporary custody of the child was "subject to visitation as described in [the] 02/24/2023 Interim Order." As indicated in the ex parte order, such temporary custody would remain in effect until May 16. A copy of the interim order was attached.

On March 9, 2023, Kathryn filed a "Motion to Dismiss, Vacate, Modify Protection Order." Kathryn alleged that the protection order contained no specific findings of fact and that "a perusal of [Cody's] affidavit discloses no allegations of any threats to put [Cody] in fear of bodily injury." Kathryn claimed the protection order was no longer necessary because she had filed a complaint for dissolution of the parties' marriage and that the protection order "appear[ed] to be a tactic used by [Cody] to preempt and influence the Dissolution action [that Kathryn] informed him she was about to file." In Cody's resistance to Kathryn's motion, he claimed there had been "no substantial change of circumstances since the entry of the protection order to warrant its dismissal" or modification, and that abuse "did occur" in that Kathryn admitted to "physically striking [Cody] at his place of employment," and Kathryn's "erratic behaviors of the last several months placed [Cody] in fear for his physical safety."

The trial court held a hearing on Kathryn's motion, and on April 18, 2023, it entered an order amending the March 2 protection order, but only to the extent that it no longer excluded Kathryn from the parties' residence (rented from her mother), since Cody had moved to a new residence from which Kathryn was excluded.

Kathryn appeals.

## III. ASSIGNMENTS OF ERROR

Kathryn assigns, reordered, that the trial court erred in (1) granting an ex parte protection order because there was no immediate danger of abuse; (2) finding that Kathryn attempted or caused bodily injury or that she made credible threats; and (3) not requiring Cody to meet his burden of proof, thereby denying Kathryn due process.

## IV. STANDARD OF REVIEW

A protection order pursuant to § 42-924 is analogous to an injunction. Thus, the grant or denial of a protection order is reviewed de novo on the record. In such de novo review, an appellate court reaches conclusions independent of the factual findings of the trial court. However, where the credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the circumstances that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Garrison v. Otto*, 311 Neb. 94, 970 N.W.2d 495 (2022).

## V. ANALYSIS

### 1. Ex Parte Protection Order

Kathryn claims the trial court erred in granting the ex parte protection order because there was no immediate danger of abuse. However, upon entry of the order affirming the ex parte order, matters pertinent to the ex parte order became moot. A moot case is one which seeks to determine a question which does not rest upon existing facts or rights, in which the issues presented are no longer alive. *Prentice v. Steede*, 28 Neb. App. 423, 944 N.W.2d 323 (2020). Since an ex parte domestic abuse protection order is a temporary order, see Neb. Rev. Stat. § 42-925(1) (Cum. Supp. 2022), the issue of whether the court erred in entering the ex parte order was relevant only from the time the order was entered until it was replaced by the final order after the show cause hearing. See *Prentice v. Steede, supra*. Therefore, any issue relating to the ex parte order is moot and need not be resolved in this appeal. *See id.*

### 2. Bodily Injury

Kathryn argues that the trial court erred in finding that she attempted to cause or actually caused bodily injury to Cody and their son or that she made credible threats of bodily injury to them. She states that "the events complained of were at least four to six months old, they were not severe, they were infrequent and they fit within the nuances of the household relationships." Brief for appellant at 11. She suggests that Cody, "facing the prospect of divorce, sought to get the upper hand in the divorce and custody action by seeking a protection order and custody," and that "such abuse of the protection order Act should not be condoned or encouraged." *Id*. at 12.

Under the Protection from Domestic Abuse Act, Neb. Rev. Stat. § 42-901 et seq. (Reissue 2016 & Cum. Supp. 2022), "[a]ny victim of domestic abuse may file a petition and affidavit for a protection order[.]" § 42-924(1)(a). Section 42-925(1) provides that a domestic abuse protection order may be issued ex parte "if it reasonably appears from the specific facts included in the affidavit that the petitioner will be in immediate danger of abuse before the matter can be heard on notice." An ex parte order is a temporary order. See *id*. A respondent may request a "show-cause

hearing" within 10 business days after service of the protection order. *Id*. Here, Kathryn timely requested a hearing and, following the hearing, the trial court affirmed the protection order.

When deciding whether to affirm or rescind an ex parte protection order, the question of whether domestic abuse occurred is a threshold issue, and absent abuse as defined by § 42-903, a protection order may not remain in effect. See *Garrison v. Otto, supra*. Section 42-903 defines, in pertinent part, the following terms:

> (1) Abuse means the occurrence of one or more of the following acts between family or household members:
>
> (a) Attempting to cause or intentionally and knowingly causing bodily injury with or without a dangerous instrument;
>
> (b) Placing, by means of credible threat, another person in fear of bodily injury. For purposes of this subdivision, credible threat means a verbal or written threat, including a threat performed through the use of an electronic communication device, or a threat implied by a pattern of conduct or a combination of verbal, written, or electronically communicated statements and conduct that is made by a person with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family . . .; or
>
> (c) Engaging in sexual contact or sexual penetration without consent . . .
>
> . . .
>
> (3) Family or household members includes spouses or former spouses, [and] children . . .

The Nebraska Supreme Court affirmed a trial court's decision to rescind an ex parte domestic abuse protection order that involved a father hitting his daughter several times on her leg. *Maria A. on behalf of Leslie G. v. Oscar G.,* 301 Neb. 673, 919 N.W.2d 841 (2018). In that case, the child's mother sought a domestic abuse protection order for her daughter against the child's father. The mother alleged that the father broke through the child's bedroom door and hit her several times on the leg with his open hand because she was involved in breaking an electronic device. The Nebraska Supreme Court determined that the one-time incident, while disturbing, did not capture the broader family dynamics at play. The court further noted that the evidence did not show any pending threat of future harm or a pattern of abuse foreshadowing future harm. The court concluded that the evidence suggested that the incident was an isolated incident not likely to recur and that a protection order was not needed to prevent future harm. Therefore, it found the trial court correctly rescinded the ex parte protection order.

In *Garrison v. Otto, supra,* the Nebraska Supreme Court more explicitly articulated the standard previously applied in *Maria A. on behalf of Leslie G. v. Oscar G., supra*, stating:

> We have also held, in the context of a court's decision to affirm or rescind an initial ex parte protection order, that a finding that domestic abuse has occurred does not end a court's inquiry. In *Maria A. on behalf of Leslie G. v. Oscar G.*[*, supra*], we explained that the goal of domestic abuse protection orders is to protect victims of domestic abuse from further harm. Thus, the court must conduct a wider inquiry that weighs the likelihood of future harm to the petitioner in light of all the surrounding circumstances. We noted that we have repeatedly analogized domestic abuse protection orders to injunctions, which

sound in equity. And injunctions are not meant to punish past actions but to prevent future mischief. On a consideration of all the circumstances of each case, the court, before issuing an injunction, weighs the burdens the order will inflict against its benefits.

*Garrison v. Otto, supra.*

In this case, we note that the trial court provided us with no direction as to what evidence it relied upon in reaching its decision. It used a form order which provided conclusions without explanations. The preprinted text in the March 2, 2023, order read as follows:

Evidence was adduced, and the court, being fully advised, finds that . . . the petitioner(s) has/have shown that the respondent:

• attempted to cause or intentionally and knowingly caused bodily injury with or without a dangerous instrument;

• by means of a credible threat, placed the petitioner(s) in fear of bodily injury; or

• ~~engaged in sexual contact or sexual penetration without consent as defined Neb. Rev. Stat. § 28-318.~~

The court manually struck out the final bullet point above; there was no evidence of nonconsensual sexual contact or penetration. In our de novo review of the record, we will consider whether the evidence established that Kathryn abused Cody or the child under either of the two remaining definitions of abuse listed above.

(a) Minor Child

*(i) Attempted or Actual Bodily Injury*

Section 42-903(1)(a) provides that one type of abuse includes "attempting to cause or intentionally and knowingly causing bodily injury." The only incident regarding any possible bodily injury to the child took place on October 18, 2022, when the child slapped Kathryn and "he thought it was funny." To teach him that it was not funny to slap people, Kathryn said she "slapped him back." Kathryn testified that the slap was not to injure her son but that it was in a "playful context" and did not cause injury or leave a mark. When Kathryn informed Cody about the incident, he laughed about it. Cody acknowledged he did not witness the incident and further testified that he was not aware of any other incidents where Kathryn had "done anything physical" to their son.

This incident does not meet the definition of abuse by way of attempted or actual bodily injury as set forth in § 42-903(1)(a). The record does not show that any bodily injury was intended nor resulted from the incident. Cody did not contradict Kathryn's description of the incident, likely because he was not present and only learned about it because Kathryn informed him of it by text. We find the evidence did not establish that Kathryn attempted to cause or intentionally and knowingly caused bodily injury to the child.

*(ii) Credible Threat of Bodily Injury*

The record also fails to show that Kathryn made a credible threat of bodily injury to the child. Section 42-903(1)(b) provides that one type of abuse includes "[p]lacing, by means of credible threat, another person in fear of bodily injury." This language has been interpreted to

mean that the evidence at trial must include some threat of intentional physical injury or any other physical threat. See *Linda N. v. William N.*, 289 Neb. 607, 856 N.W.2d 436 (2014).

While Cody described various instances where Kathryn expressed frustration with being a parent, such comments do not constitute a credible threat of bodily injury. Further, Kathryn may have been ill-tempered at times, such as when she threw dishes into the sink and dishwasher or threw toys throughout the house, but without more, these behaviors do not rise to the level of a credible threat of physical harm to the child. Finally, even Cody testified that he was not aware of any incidents, other than the slap on October 18, 2022, where Kathryn had "done anything physical to [the child]," nor was he aware of any instances where she threatened to harm the child. Kathryn also testified that she would never harm or threaten to harm the child. Therefore, the evidence fails to establish that Kathryn made a credible threat of bodily injury related to the parties' son.

Finally, we also observe that the parties reached an agreement for Kathryn to have parenting time with their son every weekend from Friday evening until Monday morning as set forth in the February 24, 2023, "Interim Order." That unrestricted weekly parenting time was maintained in the March 2 final order. Clearly, neither Cody nor the trial court perceived any credible threat of bodily injury to the parties' son given the liberal parenting time agreed to by the parties and approved by the court.

There is insufficient evidence in the record before us to prove that Kathryn subjected the parties' son to abuse, as defined by § 42-903(1). Therefore, the domestic abuse protection order entered against Kathryn in favor of the parties' minor child is reversed and remanded with directions to vacate said order.

### (b) Cody

#### (i) Attempted or Actual Bodily Injury

The only incident involving possible bodily injury to Cody took place in the fall of 2022 at Cody's workplace. Kathryn was sitting at a table with Cody and one of his coworkers when she struck Cody in the face. There was conflicting evidence whether this was done with a closed fist or open hand. Kathryn stated that Cody had a "history of belittling [her] and making comments about [her] appearance." She claimed that he told a joke that was "sexist and discriminatory," and she "did slap him." Kathryn said that Cody's response was, "'Do not slap me again in public,'" to which she replied, "'Then don't say sexist and discriminatory things to me in public.'" Kathryn claimed she slapped Cody's cheek with her left hand (she is right-handed).

Cody testified that Kathryn hit him with a closed fist on the "[r]ight side" of his face. There was no testimony regarding whether the incident resulted in a mark or injury to Cody. Even accepting Cody's version of the incident, such evidence is not sufficient to establish abuse by means of intended or actual bodily injury as set forth in § 42-903(1)(a). There was no evidence that the incident resulted in bodily injury to Cody, nor was there evidence to show that Kathryn attempted to cause or intentionally and knowingly caused Cody any bodily injury, as required by § 42-903(1)(a). Even Cody acknowledged that he and his coworker were joking with each other and that Kathryn "did not like what was said." This was consistent with Kathryn's explanation that the slap was in reaction to an offensive joke, not with the intent to cause bodily injury to Cody.

*(ii) Credible Threat of Bodily Injury*

We now consider whether Kathryn's behaviors amounted to a credible threat of bodily injury. In this regard, Cody made many general statements describing Kathryn as "violent and aggressive [in] nature" and as having worsening "episodes of anger." When asked to describe the episodes, he stated that Kathryn "ha[d] thrown toys within the house, and throw[n] them downstairs out of frustration and anger." He also described an incident where she threw a dish into the sink and another into the dishwasher. He did not testify that she threw the objects in his direction.

When asked how many times Kathryn had threatened to harm him, Cody responded, "None." When asked if he was "afraid physically that something might happen to [him] if there's not a no contact order," Cody responded, "As well as my son, yes." When asked to explain his fear, he began discussing Kathryn's noncompliance with her medication. He stated that she becomes "very irate" when she is not taking her medication and that she tells him she "fucking hates him." He stated Kathryn would "ball her fist up and visibly shake at [him] as well as yell and scream at [him]." Cody claimed that Kathryn would do this "every time we get into an argument," and yet he presented no evidence that such gestures ever resulted in him being struck, nor that he feared she would actually strike him. Although a credible threat can be established by a pattern of conduct "made by a person with the apparent ability to carry out the threat so as to cause the person who is the target of the threat to reasonably fear for his or her safety or the safety of his or her family," § 42-903(1)(b), the credible threat must nevertheless place a person "in fear of bodily injury." Based on Cody's testimony, Kathryn had never threatened to harm him. And in our review of the evidence, there was no evidence that Kathryn engaged in any conduct that should have caused Cody to fear for his safety or the safety of his family.

But even if Kathryn's behavior could be considered abuse by means of credible threat, in the context of a trial court's decision to affirm or rescind an initial ex parte protection order, a finding that domestic abuse has occurred does not end a court's inquiry. See *Garrison v. Otto*, 311 Neb. 94, 970 N.W.2d 495 (2022). The goal of domestic abuse protection orders is to protect victims of domestic abuse from further harm. See *id.* Thus, the court must conduct a wider inquiry that weighs the likelihood of future harm to the petitioner in light of all the surrounding circumstances. See *id.* Much like in *Maria A. on behalf of Leslie G. v. Oscar G.,* 301 Neb. 673, 919 N.W.2d 841 (2018), here, the physical contact that took place in the fall of 2022 was an isolated incident. Cody even testified that this was the only time Kathryn had ever hit him and he stated that she had never threatened to harm him. Further, when describing his fear that Kathryn would harm him, Cody seemed to focus on her noncompliance with her medication and her resulting anger. However, Kathryn testified that at the time of the hearing, she was compliant with her medication.

The record also indicated that Kathryn and Cody were living in separate residences, and Kathryn had filed for a dissolution of the parties' marriage. Therefore, even assuming Kathryn's behaviors constituted abuse, a protection order was not necessary to protect Cody from future harm since the parties can now address spousal and parental behaviors in the district court where their marriage dissolution action is pending. Accordingly, we conclude there is insufficient evidence in the record before us to support the entry of a domestic abuse protection order against Kathryn with respect to Cody, and such order must be reversed and remanded with directions to vacate the same.

### 3. Burden of Proof

Kathryn complains that at the show-cause hearing, the trial court insisted that Kathryn present her evidence first even though Kathryn's counsel pointed out that the initial burden is on the petitioner at a show-cause hearing for a domestic abuse protection order. The trial court stated that "the first burden is on the respondent." Kathryn argues that the court's "mistaken placement of the burden on Kathryn not only runs afoul of the procedure established by the Nebraska Supreme Court," but it also violates the due process guarantees of the U.S. and Nebraska Constitutions. Brief for appellant at 10. She argues that the "faulty procedure" in this case resulted in the issuance of a protection order founded on Kathryn "not satisfying her burden of proof rather than being founded on [Cody] meeting his burden of proof." *Id.*

Although we have decided this appeal on other grounds, the confusion as to the procedure used in this case warrants some discussion. Kathryn is correct in pointing out that the Nebraska Supreme Court has previously determined that a petitioner at a show-cause hearing following an ex parte order has the burden to prove by a preponderance of the evidence the truth of the facts supporting a protection order. See *Maria A. on behalf of Leslie G. v. Oscar G., supra*. A prima facie case for a protection order may be established by a form petition and affidavit. See *Mahmood v. Mahmud*, 279 Neb. 390, 778 N.W.2d 426 (2010). Once that burden is met, the burden shifts to the respondent to show cause as to why the protection order should not remain in effect. See *Maria A. on behalf of Leslie G. v. Oscar G., supra.*

In this case, the petition and affidavit were not offered as evidence by Cody. Previously, in the absence of any other evidence offered at a show cause hearing, a petitioner's failure to offer the petition and affidavit as evidence would result in there being insufficient evidence to support a protection order. See, for example, *Mahmood v. Mahmud, supra* (although prima facie case for protection order may be established by form petition and affidavit, they cannot be considered as evidence until offered and accepted at trial). However, § 42-925(1) was amended by the Legislature in 2019, and it now says, "The petition and affidavit shall be deemed to have been offered into evidence at any show-cause hearing," and shall be "admitted into evidence unless specifically excluded by the court."

There was no specific exclusion of the petition and affidavit by the trial court in this case, and therefore, according to § 42-925(1), they were deemed offered and admitted as evidence at the February 22, 2023, show-cause hearing without any action required by Cody. As such, it may explain why the trial court proceeded as though Cody had satisfied his initial burden of proving a prima facie case for a protection order, thus shifting the burden to Kathryn to show cause as to why the protection order should not remain in effect. See *Maria A. on behalf of Leslie G. v. Oscar G., supra*. However, because we have decided this appeal on other grounds, we need not determine whether the trial court improperly shifted the burden of proof when it stated that "the first burden is on the respondent" and required Kathryn to present her evidence before Cody.

### VI. CONCLUSION

Because there was insufficient evidence to support a domestic abuse protection order in favor of Cody and the minor child against Kathryn, we reverse and remand with directions to the trial court to vacate the protection order entered in this case.

Reversed and remanded with directions.